CLERKS OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

July 8, 2024

LAURA A. AUSTIN, CLERK
BY: s/ FELICIA CLARK
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

NATORI BENTON,

                        Plaintiff,

v.

UNITED STATES OF AMERICA

and

MERRICK GARLAND
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530

and

COLETTE PETERS
Director
Federal Bureau of Prisons
320 First Street, N.W.
Washington, DC 20534

and

CHRISTOPHER GOMEZ
Regional Director
Mid-Atlantic Region
302 Sentinel Drive
Annapolis Junction, MD 20701

and

J.C. STREEVAL
Former Warden
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

Case No.    1:24CV25

**JURY TRIAL DEMANDED**

and

JOHN GILLEY
Warden
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

JACKIE MITCHELL
Lieutenant
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

JONATHAN LEE NICHOLS
Lieutenant
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

BRADLEY PARSONS
Lieutenant
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

TIMOTHY D. THOMAS II
Lieutenant
United States Penitentiary, Lee
Lee County Industrial Park

2

Hickory Flats Road
Pennington Gap, VA 24277

and

SPENCER TURNER
Lieutenant
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

RICKY D. BRADBURN
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

JASON FISCHER
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

STEPHEN JACKSON
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

ANDREW LAWSON
Officer
United States Penitentiary, Lee
Lee County Industrial Park

3

Hickory Flats Road
Pennington Gap, VA 24277

and

WILLIAM T. FIELDS
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

WILL HAMILTON
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

AARON THOMPSON
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

RAYMOND C. HOSKINS
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

MATTHEW M. GILMER
Officer
United States Penitentiary, Lee
Lee County Industrial Park

4

Hickory Flats Road
Pennington Gap, VA 24277

and

JAMIE D. GILBERT
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

JOSH ROBBINS
Officer
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

ERNEST L. ASHLEY, R.N.
Health Services
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

LEON CAUDILL, R.N.

Health Services
United States Penitentiary, Lee
Lee County Industrial Park
Hickory Flats Road
Pennington Gap, VA 24277

and

DR. JOSE CAPRILES-MERCADO, PsyD
Psychology Services
United States Penitentiary, Lee

Hickory Flats Road
Pennington Gap, VA 24277,

Defendants.

## COMPLAINT

Plaintiff Natori Benton ("Plaintiff" or "Mr. Benton"), through undersigned counsel, files this Complaint against Defendants United States of America, and Merrick Garland, Colette Petters, Christopher Gomez, J.C. Streeval, John Gilly, Jackie Mitchell, Jonathan Lee Nichols, Timothy D. Thomas II, Bradley Parsons, Spencer Turner, Ricky D. Bradburn, Jason Fischer, Stephen Jackson, Andrew Lawson, William T. Fields, Will Hamilton, Aaron Thompson, Raymond C. Hoskins, Matthew M. Gilmer, Jamie D. Gilbert, Josh Robbins, Ernest L. Ashley, Leon Caudill, and Dr. Jose Capriles-Mercado (collectively "Defendants;" without the United States, "Individual Defendants"). Plaintiff seeks damages for injuries and injunctive relief he suffered as a result of Defendants' violation of his constitutional rights through their use of excessive force and deliberate indifference and breach of their duties to protect Mr. Benton's safety. Mr. Benton also seeks damages based on tortious conduct committed by certain Defendants, including assault, battery, negligence, and medical malpractice. Plaintiff hereby alleges, based on his personal knowledge, information, and belief, as follows.

## NATURE OF ACTION

1. "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted). Moreover, under the Eighth Amendment, prisoners must have "the minimal civilized measure of life's necessities," *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), including "basic human needs," such as food, sanitation, and medical care. *Id.*

2. Mr. Benton, a resident at United States Penitentiary Lee ("USP Lee") at all times

6

relevant to this Complaint, is among the hundreds of residents who have been routinely subjected to unwarranted and excessive physical assaults, racial discrimination, and depravation of basic human needs in violation of the United States Constitution.  Mr. Benton's tormentors are the Warden, guards, and other staff at USP Lee who are responsible for protecting Mr. Benton's rights, ensuring his safety, and providing for his basic human needs.  These Defendants intentionally betray, spectacularly, these basic obligations to Mr. Benton and the other residents at USP Lee.  At USP Lee, residents are not only serving time, but they are also being physically and mentally destroyed by the individuals tasked with carrying out their sentences.

3.    Mr. Benton understands that, as a resident serving time in a federal penitentiary, his civil rights are subject to constraints that do not exist outside of a penitentiary.  But certain fundamental constitutional rights remain, even for an  <u>individual serving time, like</u>  Mr. Benton. And a torture chamber sanctioned by the federal government in which Defendants brutally assault residents like Mr. Benton; a prison administration in which almost-exclusively-white guards discriminate against and commit violent criminal acts disproportionately against persons of color; a prison in which Defendants enlist and threaten residents to "put in work" by committing violent physical acts against other residents; a prison staff that dehumanizes residents by parading them nearly nude through the facility while mocking their race and genitalia (and in some instances sexually assaulting residents along the way); depriving residents of food, sanitary living conditions, and basic medical care; and employing violence and restraints for periods lasting several days in contravention of codified prison policies—none of this comes even close to meeting the lowest possible standards for resident care at a federal penitentiary.

4.    To make matters worse, Defendants have engaged in a coordinated effort to silence complaints by residents, such as Mr. Benton, by depriving them of their limited redress for these

egregiously horrifying conditions.  Defendants do so by withholding the forms residents use to lodge grievances for misconduct by prison staff, destroying said forms in those circumstances where they do distribute them, refusing to submit or mail completed grievance forms in the required timeframes, and withholding mailed correspondence from the Regional Office from residents such that their deadlines to respond pass before residents can proceed with the next step in their administrative grievance process.  Defendants also intimidate and retaliate against residents, like Mr. Benton, who pursue legitimate administrative grievances against prison staff for abuse, including by isolating residents in the Special Housing Unit ("SHU") without justification or based on false premises; interfering with communications between residents and their counsel, and; opening and reading clearly marked privileged legal mail communications.  Residents who dare to speak out against staff abuse are moved to other facilities.  As a practical matter, the limited rights residents have to pursue lawsuits for abuse pursuant to the Prison Litigation Reform Act are systematically thwarted by the administration at USP Lee through the means described above.  As a result, it is virtually impossible for a resident who has suffered abuse and consistent torment since he stepped foot on the USP Lee compound, such as Mr. Benton, to navigate a complex multi-step grievance process in order to exhaust his administrative remedies under 42 U.S.C. § 1997e(a) and then bring a civil lawsuit.

## JURISDICTION AND VENUE

5.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 171 and 28 U.S.C. § 1346(b) because Mr. Benton's claims present federal questions regarding rights arising under the Constitution and laws of the United States, as well as claims alleging negligence and other wrongful acts by employees of the federal government.

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because one or more of Defendants reside in this judicial district, and all or a substantial portion of the events,

8

acts, or omissions giving rise to Plaintiff's claims occurred, in whole or in part, in Pennington Gap, Virginia, in the Western District of Virginia.

## **PARTIES**

A.   Plaintiff.

7.   Plaintiff Natori Benton (Mr. Benton") is a 26-year-old man who, at all times relevant to this Complaint, was a resident at USP Lee.  Prior to his incarceration, Mr. Benton resided in and was a citizen of the State of North Carolina.  Mr. Benton arrived at USP Lee on or around February 8, 2023, and has since been a repeated victim of mistreatment and abuse by USP Lee officers.  Mr. Benton's abuse has included being assaulted during his transfer from then USP, now FCI Atlanta (hereinafter USP Atlanta) to USP Lee; being tortured and sexually assaulted by USP Lee officers while in four-point restraints; being forced to endure poor living conditions while in the SHU; and being the subject of falsified incident and disciplinary reports, among other misconduct by Defendants.

B.   Defendants.

8.   Defendant United States of America ("United States") created and oversees the BOP, a federal law enforcement agency within the U.S. Department of Justice that operates U.S. federal prisons and is responsible for the care, custody, and control of individuals who reside at these facilities. The United States employs all BOP correctional officers, guards, and staff named as Defendants in this action.  At all times relevant herein, the individual Defendants in this action were acting as agents of the United States.

9.   Defendant Merrick Garland ("Garland" or "Defendant Garland") is the Attorney General of the United States.  The Attorney General is the head of the United States Department of Justice, which includes the Bureau of Prisons.  Defendant Garland is being sued in his official capacity.

9

10.     Defendant Colette Peters ("Peters" or "Defendant Peters") is the Director of the Bureau of Prisons ("BOP").  The Director is responsible for the operation of 122 BOP facilities, including USP Lee, six regional offices, two staff training centers, and 22 residential reentry management field offices.  She is also responsible for the oversight and management of approximately 35,000 staff and 160,000 incarcerated individuals.  Defendant Peters is being sued in her official capacity.

11.     Defendant Christopher Gomez ("Gomez" or "Defendant Gomez") is the Regional Director of the Mid-Atlantic Region for the BOP, which includes USP Lee.  The Regional Director oversees the operation of 21 BOP facilities, including USP Lee.  He is responsible for the oversight and the management of more than 6,200 employees and the custody and care of approximately 27,000 incarcerated individuals.  Defendant Gomez is being sued in his official capacity.

12.     Defendant J.C. Streeval ("Defendant Streeval")[1] is the former Warden of USP Lee, and he served as Warden during some of the time Mr. Benton was incarcerated at USP Lee.  He was responsible for overseeing the operations at USP Lee, including resident housing decisions, the use of force, the use of restraints, and the administration and provision of medical care to residents.  He is sued here in his individual capacity.  Upon information and belief, Defendant Streeval resides in Tennessee and worked in the Commonwealth of Virginia.

13.     Defendant John Gilley ("Defendant Gilley") is the Warden of USP Lee. He is responsible for overseeing the operations at USP Lee, including resident housing decisions, the

---

[1] Warden Streeval arrived at USP Lee in 2020.  Since then, he has been named as a defendant in at least eighteen other actions in the U.S. District Court for the Western District of Virginia.  In these actions, plaintiffs allege Warden Streeval has engaged in acts, through his work at USP Lee, relating to:  failure to protect residents, torture, assault, sexual harassment, unreasonable searches and seizures, violations of due process rights, violations of equal protection rights, derelictions of duty, negligence leading to assault and death, deliberate indifference to prisoners' lives, retaliation against prisoners, abuse of power and authority, failure to follow CDC guidelines, cruel and unusual punishment, reckless disregard for life, provision of unlawful living conditions, denial of medical treatment to prisoners, unlawful imprisonment, denial of prisoner access to legal materials, mail tampering, retaliatory excessive force, falsifying official prison reports, excessive force, failing to provide access to legal remedies, and entrapment.

10

use of force, the use of restraints, and the administration and provision of medical care to residents. He is sued here in his official capacity. Upon information and belief, Defendant Gilley resides and works in the Commonwealth of Virginia.

14. Defendant Jackie Mitchell ("Defendant Mitchell) is a Lieutenant Officer at USP Lee. She is sued here in her individual capacity. Upon information and belief, Defendant Mitchell resides and works in the Commonwealth of Virginia.

15. Defendant Jonathan Lee Nichols ("Defendant Nichols") is a Lieutenant Officer at USP Lee. He is sued here in his individual capacity. Upon information and belief, Defendant Nichols resides and works in the Commonwealth of Virginia.

16. Defendant Bradley Parsons ("Defendant Parsons") is a Lieutenant Officer at USP Lee. He is sued here in his individual capacity. Upon information and belief, Defendant Parsons resides and works in the Commonwealth of Virginia.

17. Defendant Timothy D. Thomas ("Defendant Thomas") is a Lieutenant Officer at USP Lee. He is sued here in his individual capacity. Upon information and belief, Defendant Thomas resides and works in the Commonwealth of Virginia.

18. Defendant Spencer Turner ("Defendant Turner") is a Lieutenant Officer at USP Lee. He is sued here in his individual capacity. Upon information and belief, Defendant Turner resides in the state of Kentucky and works in the Commonwealth of Virginia.

19. Defendant Will Bradburn ("Defendant Bradburn") is a Correctional Officer at USP Lee. He is sued here in his individual capacity. Upon information and belief, Defendant Bradburn resides and works in the Commonwealth of Virginia.

20. Defendant Jason Fischer ("Defendant Fischer") is a Correctional Officer at USP Lee. He is sued here in his individual capacity. Upon information and belief, Defendant Fischer

11

resides in the state of Tennessee and works in the Commonwealth of Virginia.

21.    Defendant Stephen Jackson ("Defendant Jackson") is a Correctional Officer at USP Lee.  He is sued here in his official capacity.  Upon information and belief, Defendant Stephen Jackson resides and works in the Commonwealth of Virginia.

22.    Defendant Andrew Lawson ("Defendant A. Lawson") is a Correctional Officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant A. Lawson resides and works in the Commonwealth of Virginia.

23.    Defendant William T.  Fields ("Defendant Fields") is a Correctional Officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Fields resides and works in the Commonwealth of Virginia.

24.    Defendant Will Hamilton ("Defendant Hamilton") is a Correctional Officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Hamilton resides and works in the Commonwealth of Virginia.

25.    Defendant Aaron Thompson ("Defendant Thompson") is a Correctional Officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Thompson resides and works in the Commonwealth of Virginia.

26.    Defendant Raymond C. Hoskins ("Defendant Hoskins") is a Correctional Officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Hoskins resides and works in the Commonwealth of Virginia.

27.    Defendant Matthew M. Gilmer ("Defendant Gilmer") is a Correctional Officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Gilmer resides and works in the Commonwealth of Virginia.

28.    Defendant Jamie D. Gilbert ("Defendant Gilbert") is a Correctional Officer at USP

Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Gilbert resides and works in the Commonwealth of Virginia.

29.     Defendant Josh Robbins ("Defendant Robbins") is a Correctional Officer at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Robbins resides and works in the Commonwealth of Virginia.

30.     Defendant Ernest L. Ashley ("Defendant Ashley") is a Registered Nurse employed with Health Services at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Ashley resides and works in the Commonwealth of Virginia.

31.     Defendant Leon Caudill ("Defendant Caudill") is a Registered Nurse employed with Health Services at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Caudill resides and works in the Commonwealth of Virginia.

32.     Defendant Jose Capriles-Mercado ("Defendant Capriles-Mercado") is a psychologist employed with Psychology Services at USP Lee.  He is sued here in his individual capacity.  Upon information and belief, Defendant Capriles-Mercado resides in the state of Tennessee and works in the Commonwealth of Virginia.

**FACTS**

33.     USP Lee is a federal penitentiary located in Pennington Gap, Virginia.

34.     USP Lee is a high-security facility that houses approximately 1,500 adult males who are high security offenders.[2]  USP Lee has twelve housing units located in three buildings. Each housing unit can house 128 offenders.[3]

35.     USP Lee has one SHU.  The purported purpose of the SHU is to 1) house residents

---

[2] Charles Thronton et al., *USP Lee Follow-Up Inspection Report*, D.C. Corr. Info. Council (Sept. 6, 2019), https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/USP%20Lee%20Inspection%20Report%20FINAL%20with%20BOP%20response%209-6-19.pdf.
[3] *USP Lee*, Fed. Bureau of Prisons, https://www.bop.gov/locations/institutions/lee/.

in disciplinary segregation as a result of a formal disciplinary finding; 2) house residents on administrative detention pending transfer or investigation of a disciplinary infraction; and 3) house residents in protective custody.[4]

36.    In reality, the SHU, which is routinely kept at full capacity by USP Lee's administration, is used as a venue for extreme abuse and retaliation against residents by prison staff.  Indeed, individuals housed in the SHU often hear the screams of other residents as they are tortured by prison staff around the clock, typically within the two holding cells located in the SHU.  These holding cells do not have toilets, and individuals who are abused in those cells, often over the course of consecutive days, are forced to defecate and urinate on themselves.

37.    The prison staff, including Defendants, strategically conceal their abuse, and will often place toilet paper over the cameras in the SHU holding cells, which do not capture sound, to prevent their actions from being recorded.  In other instances, residents are taken by prison staff to blind spots in the SHU and passages leading to and from it, where cameras cannot record the abuse that occurs.  In still other instances, prison staff will threaten an individual to violently attack his cellmate within their own cell, where cameras are also not located.

38.    To further conceal the abuse of prisoners, residents are forced, under the threat of additional violence, to state in a video recording captured by medical personnel that they do not have any injuries.

39.    The SHU contains a medical examination room that is rarely, if ever, used to conduct actual medical evaluations.  The medical staff tasked with providing care in the SHU, including mental health professionals, are deliberately indifferent to the abuse and torture that takes place, and the severe injuries that result.  USP Lee medical staff are often complicit in the efforts

---

[4] *Program Statement on Special Housing Units*, Federal Bureau of Prisons at 3–6; 9 (Nov. 23, 2016), https://www.bop.gov/policy/progstat/5270.11.pdf.

14

of other prison staff to conceal injuries by ignoring injuries to prisoners and/or by falsifying medical reports. Indeed, medical staff, including Nurse Ashley, are often present in the cell (and sometimes themselves participate in the assault of residents) while prisoners are being repeatedly kicked, punched, and tortured by prison staff, but they nevertheless report that victims have suffered no injuries.

40. The conditions of confinement in the SHU are inhumane. Individuals are not provided proper or clean clothing, and are sometimes forced by prison staff to wear paper gowns that expose their genitalia—leading to sexually and racially abusive commentary, and at times sexual abuse, by prison staff. When prisoners are given SHU uniforms, they are often forced to wear the same tattered, dirty clothing for several days in a row. Individuals are given a total of 10–12 squares of toilet paper per day. The toilets malfunction regularly, and individuals are forced to leave their feces in towels until maintenance staff arrives, which sometimes takes several days. Individuals are forced to eat bologna sandwiches after prison staff smear them across a dirty floor. In some cases, food is withheld from prisoners altogether for days on end. Recreation time is inconsistent and generally nonexistent. Windows in the SHU are sandblasted which prevents any natural light from entering cells, leaving residents to receive small slivers of sunlight through tiny cracks in the sandblast.

41. Access to the law library in the SHU is non-existent due to prison staff routinely reporting that the law library computers are broken or inaccessible.

42. Prisoners suffering from these horrible conditions and treatment are given only limited access to grievance forms to lodge complaints against USP Lee staff. USP Lee officers will not only refuse to give the grievance forms to individuals who request them, but when they do, will also at times provide the wrong form, and/or fail to transmit completed grievance forms

15

to the appropriate personnel in the required timeframes. Indeed, USP Lee officers, including Defendant Fischer, threaten individuals who attempt to access administrative grievances with more and more severe violence.

43. Although the SHU is generally reserved for individuals who either pose a threat to other residents, staff, or are at risk of harm, Defendant Nichols, Defendant Gilbert, Defendant Thompson, and Defendant A. Lawson contribute to the confinement of individuals like Mr. Benton in the SHU for no legitimate reason. Residents are remanded to the SHU (which is almost always fully occupied) so that prison staff can take advantage of seemingly vulnerable residents, and/or as a retaliation for an individual's complaints regarding the unconstitutional conditions at USP Lee and/or requests for medical and mental health care.

44. When all of the cells in the SHU are full and prison staff want to transfer an individual in a particular unit to the SHU, the resident's particular unit is placed on "lockdown." When a unit is on lockdown, individuals in that unit do not receive hot meals, are not permitted to shower regularly, do not receive clean clothing, do not receive phone calls or visits from family, and cannot access the prison's programming or the law library.

45. The almost-exclusively-white prison staff at USP Lee discriminates against residents of color by disproportionately targeting them for physical violence, other forms of abuse, depriving them of medical attention and other basic rights, and housing them in the SHU. Prison staff also regularly, consistently, and openly use vulgar racial epithets to refer to Black and Hispanic residents. As they did with Mr. Benton, Defendants take pride in their culture of violence against non-white residents by gruesomely pulling out residents' hair and hanging it for display on the penitentiary's fences.

46. Prison staff often force prisoners to "put in work" by fighting each other, targeting

16

certain residents for violence.  USP Lee officers purposefully pair individuals who pose a safety threat to each other in the same cell—creating dissonance between them by sharing otherwise protected information about the individual's prior conviction or disseminating lies about the same based on prior disciplinary infractions.  USP Lee officers will alert one cellmate that the other is a child molester, referring to the offending resident as a "cho mo," and then demand that his non-offending cellmate beat the one labeled as a "cho mo."  USP Lee officers threaten to physically assault and abuse any cellmates who do not comply.  As a result, most cellmates agree to fight each other rather than risk organized assault by the USP Lee officers.

47.    The culture of inhumane violence and abuse at USP Lee, experienced first-hand by Mr. Benton, has been previously documented at length.  Another former USP Lee resident, Marcos F. Santiago, filed a similar complaint on October 13, 2023, alleging and recounting, among other things, acts of violence and torture against him at the hands of USP Lee officers and staff.[5] Additionally, in a September 6, 2019 "Follow-Up Inspection Report,"[6] investigators at the District of Columbia Corrections Information Council (the "CIC")[7] reported a litany of unconstitutional and sub-standard practices, including the following:

- Many residents expressed the expectation that they would face some form of retaliation for their participation in CIC interviews, from physical assaults by staff, to loss of facility jobs, to having their mail held for an excessive period.[8]

---

[5] *See Santiago v. Streeval*, No. 7:23-cv-000064 (W. D. Va.).
[6] *See generally* Charles Thronton et al., *USP Lee Follow-Up Inspection Report*, D.C. Corr. Info. Council (Sept. 6, 2019), https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/USP%20Lee%20Inspection%20Report%20FINAL%20with%20BOP%20response%209-6-19.pdf.
[7] The District of Columbia does not maintain its own prison system.  Instead, individuals sentenced for felony offenses under the D.C. Code are transferred to the federal Bureau of Prisons.  The CIC is an independent oversight entity maintained by the U.S. Congress and the Council of the District of Columbia to inspect, monitor and report on conditions of confinement at all facilities, including federal facilities, where D.C. Code offenders are housed.
[8] *Id.* at 8, I.

- Individuals reported being left in four-point restraints for 12 to 13 hours and more than 16 hours without access to toilets.[9]

- Several individuals mentioned a regular practice in which residents were assaulted, restrained, put in a paper gown, and forced to walk backwards in view of other residents.[10]

- One resident was slammed to the ground by an officer and then tied to a chair and left in an office for an hour before being transported to the SHU.[11]

- Residents said that staff beat residents with apples in socks or through a shield to prevent leaving marks of the assault.

- Individuals reported sexual assault or sexual harassment by staff, including seeing an officer grab a resident's testicles.

- One resident reported that a lieutenant put a shield on the resident's chest, and kneeled on it while the resident was on his back and shackled.[12]

- Prison staff regularly use racial slurs.[13]

- During cell shakedowns, officers routinely sweep residents' belongings into the trash, including clothes, food, and hygiene products purchased off commissary, and fail to provide documentation of the confiscation of their property.[14]

- The USP Lee staff undermine or outright foreclose residents from pursuing the Bureau of Prisons Grievance Process.  Residents have complained of being

---

[9] *Id.* at 8, II.
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.* at 8, IV.
[14] *Id.*

told by Warden Streeval that grievances would "never make it out of the SHU."[15]  Other prison staff have told residents that their complaints will never go anywhere "because the Warden will lie for his staff."[16]

- Officers and USP Lee leadership have refused to separate cellmates who requested separation due to interpersonal conflict and the inherent safety risks caused by the conflicts, and have told residents to fight or stab each other.[17]

- Residents are not provided adequate medical care.[18]

- Residents have been forced to clean up raw sewage flooding into the cells without adequate protection.[19]

- USP Lee was on lockdown for most of 2018 because the SHU was operating at or near capacity.[20]

48.    As described further below, nothing has changed at USP Lee since the CIC report was issued.  The injuries sustained by Mr. Benton in 2023 and the unconstitutional practices that continue to be the norm at USP Lee are just the latest in a history of abuse that goes back many years.

**BOP Guidelines on Use of Force**

49.    The injuries sustained by Mr. Benton arose, in part, from practices that are expressly forbidden under the policies and regulations that govern staff conduct at USP Lee.

50.    The BOP strictly limits the use of force, including the placement of residents in restraints, as a last alternative after all other reasonable efforts to control a resident or situation

---

[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.* at 11, V.
[19] *Id.* at 12, VI.
[20] *Id.* at 9, III.

have failed.[21]  When authorized, staff must use only that amount of force necessary to gain control of the resident, to protect and ensure the safety of residents, to prevent serious property damage, and to ensure institutional security and good order.[22]

51.    Prison staff may only use physical restraints if it is necessary to gain control of a resident who appears to be dangerous because the resident:  (a) assaults another individual; (b) destroys government property; (c) attempts suicide; (d) inflicts injury upon self; or (e) becomes violent or displays signs of imminent violence.[23]

52.    Under no circumstances may physical restraints be employed to punish residents.[24]

53.    BOP regulations further state that prison staff may temporarily apply physical restraints when one of the above requirements is met; however, the Warden or designee must decide whether the use of physical restraints should continue.[25]  If physical restraints are used, BOP policy mandates that the least restrictive restraint method be used that is necessary for the situation.[26]  Specifically, "ambulatory restraints" (i.e., handcuffs, leg irons, and a belly chain) should initially be used if possible, and "four-point restraints" (i.e., chaining a resident to a bed at his wrists and ankles) should be used if they are the only means available to obtain and maintain control over a resident.[27]  The Warden is the only official at the prison who can decide whether and when "four-point restraints" should be used, and this duty cannot be delegated below the Warden's level.[28]

54.    When a resident is restrained for longer than eight hours, BOP regulations require

---

[21] *Program Statement on Use of Force and Application of Restraints*, Federal Bureau of Prisons ¶ 5 (Nov. 30, 2005), https://www.bop.gov/policy/progstat/5566_006.pdf.
[22] *Id.* ¶ 6(c).
[23] *Id.* ¶ 1.
[24] *Id.* ¶ 6(h)(1).
[25] *Id.* ¶ 6(d).
[26] *Id.* ¶ 9.
[27] *Id.* ¶ 10.
[28] *Id.*

that the Warden, the Warden's designee, or the institutional administrative duty officer notify the BOP's Regional Director or Regional Duty Officer.[29]

55.    When a resident is chained using the "four-point restraint" method, a review of that resident's chaining in four-point restraints must be made by a lieutenant every two hours to determine if the restraints have had a calming effect so that the resident may be released from the restraints.[30]

56.    As soon as an officer determines the resident has regained physical control and is no longer a threat to himself, other residents, or property, their restraints must be removed.[31]  Staff members violate BOP policy if they keep residents restrained longer than necessary, or if they restrain residents to punish or discipline them.[32]

57.    Under BOP policy, all "use of force incidents must be reported and investigated . . . to eliminate the unwarranted use of force."[33]  In addition, prison staff must report the use of force directly to the Assistant Director, Correctional Programs Division; Assistant Director, Health Services Division; Central Office Correctional Services Administrator; Regional Director; and the Regional Correctional Administrator.[34]  These reporting protocols ensure that BOP management, from prison staff to the Warden to the Regional Director of the BOP, participates in the decision-making and monitoring process in the use of force, and that prison staff do not inappropriately use force on residents.

58.    As discussed further below, virtually none of these BOP regulations were complied with in using restraints on Mr. Benton.

---

[29] *Id.* ¶ 10(g).
[30] *Id.* ¶ 10(e).
[31] *Id.* ¶ 5.
[32] *Id.* ¶ 6(b).
[33] *Id.* ¶ 6(j).
[34] *Id.* ¶ 14(a)(1)–(5).

**Defendants' Assault of Mr. Benton During His Transfer from USP Atlanta to USP Lee**

59.     On the morning of February 8, 2023 around 8:00 AM, Mr. Benton transferred from USP Atlanta to USP Lee. During his transfer, Mr. Benton was harassed and sexually assaulted by several USP Lee officers.

60.     Prior to boarding the bus to USP Lee, Mr. Benton was placed in a holding cell at USP Atlanta, and strip searched by Defendant Nichols who told Mr. Benton to get naked, to squat, and to cough.  While Mr. Benton was naked, Defendant Nichols began to verbally antagonize Mr. Benton and asked Mr. Benton why he was smiling.  Mr. Benton was not smiling and did not respond.

61.     Defendant Nichols told Mr. Benton to pick his socks up off of the floor.  Mr. Benton complied by picking his socks up off of the floor and giving them to Defendant Nichols.  Defendant Nichols then threw Mr. Benton's socks back at him and asked, "Is something still funny?"  Again, Mr. Benton was not smiling or laughing, and did not respond.

62.     Defendant Nichols walked out of the holding cell and came back with additional officers, including Defendant Thomas and Defendant A. Lawson, who surrounded Mr. Benton. Without reason, Defendant Nichols punched Mr. Benton in his face.  Defendant A. Lawson followed up with a second punch to Mr. Benton's face.  Mr. Benton instantly became dazed and grabbed a wall to stabilize himself.  As Mr. Benton reached down to grab his socks that had fallen onto the floor, Defendant A. Lawson, standing in front of Mr. Benton, pushed Mr. Benton into the wall behind him.  Defendant Nichols then grabbed Mr. Benton by his hair, slammed him back against the wall, and pushed him down towards the ground as Defendant Thomas punched Mr. Benton in his sides and ribs.  As Mr. Benton was falling towards the ground, Defendants continued to beat him and stomp on his feet while he remained naked.

63.     Once Mr. Benton was on the floor, Defendants began to kick Mr. Benton's legs,

22

abdomen, and pulling the hair on his head.  For about five minutes, Defendants continued to gruesomely assault Mr. Benton while he was naked.

64.    As a result of this attack, Mr. Benton sustained several injuries, including having all of the hair in the back of head pulled out, as well as open wounds and bruises all over his body, including his ribs and the top of his feet and toes.

65.    Following this assault, Defendants Nichols, Thomas, and A. Lawson put Mr. Benton in handcuffs and forced him into ankle shackles, but did not provide Mr. Benton with any shoes.  Defendants Nichols, Thomas, and A. Lawson then took Mr. Benton into another room and made Mr. Benton get onto his knees in the corner of the room with tile floors, while in restraints, as other residents were getting dressed and preparing to leave.  Defendants left Mr. Benton in the room, still restrained, by himself for about ten minutes while a group of other residents were loaded onto the bus.

66.    After a majority of other residents were seated on the bus, Defendants Nichols, Thomas, and A. Lawson escorted Mr. Benton onto the bus.  While on the bus, Defendant Nichols continued to target and verbally abuse Mr. Benton.  Despite Mr. Benton's multiple requests, Defendant Nichols denied Mr. Benton access to the restroom on the bus.  Defendant Nichols also denied Mr. Benton food and water and told him that he would have to wait to eat until he got to USP Lee, although other residents were provided food while on the bus.

67.    After traveling about two hours from USP Atlanta, the bus broke down in Chattanooga, Tennessee.  While waiting in Chattanooga in a parking lot a replacement bus from USP Lee, Mr. Benton's ankles remained shackled tightly, and he continued to be denied access to food, water, and the restrooms.

68.    When a replacement bus arrived four hours later, Mr. Benton was the first person

23

to be escorted off of the broken-down bus and onto the replacement bus. Due to the tightness of his ankle restraints, and still without proper footwear, Mr. Benton was not walking quickly enough to satisfy Defendant Nichols, so Defendant Nichols began to drag Mr. Benton down the steps of the bus by grabbing the back of his neck. While getting onto the replacement bus, Defendant Nichols continued to drag Mr. Benton up the steps of the bus by his arm. Because Mr. Benton still did not have on any shoes, this forceful dragging began to injure his feet. When Mr. Benton told Defendant Nichols that the shackles were too tight on his ankles and to give him time to walk, Defendant Nichols told Mr. Benton to shut up. Mr. Benton complied.

69.    While traveling on these buses, Defendant Nichols repeatedly, and no less than six or seven times, slammed Mr. Benton's head into the window and called him "nigger," leaving Mr. Benton with swelling and knots on his head. Mr. Benton told Defendant Nichols that he would inform his family and pursue legal action against him for his mistreatment, but Defendant Nichols brushed off Mr. Benton's warnings and reminded Mr. Benton that he was "just another nigger."

70.    Defendant Nichols further threatened Mr. Benton by telling him that once they arrived at USP Lee, he would put Mr. Benton into four-point restraints. Upon arrival at USP Lee on February 8, 2023 around 8:00 PM, after about a four-hour ride from Chattanooga, Defendant Gilbert came onto the bus and asked, "Who is Benton?" Once Mr. Benton was identified, Defendant Gilbert escorted him off the bus ahead of the other residents, forcing him to walk into the facility backwards, in restraints, and with his head down in an effort to prevent the injuries Mr. Benton had sustained to his face from being captured by the cameras in and around the entrance of the facility.

**Defendants' Assault and Torture of Mr. Benton at USP Lee**

A.    February 8–10, 2023.

71.    Between February 8, 2023, and February 10, 2023, the harassment and torture of

24

Mr. Benton by USP Lee officers continued.

72.     Upon arrival at USP Lee, and once inside the facility, Defendant Nichols, Defendant A. Lawson, Defendant Thompson, Defendant Gilmer, Defendant Bradburn, and other Unknown Defendants escorted Mr. Benton to a holding cell in the Receiving and Discharge ("R&D") Department, which handles the processing of new residents.[35]  Mr. Benton was neither handprinted nor searched during his processing into USP Lee, which is a typical protocol for residents who are transferring into a new BOP facility.

73.     Instead, while Mr. Benton was entering the R&D holding cell, an officer asked Mr. Benton if he had gotten into an altercation with Defendant Nichols.  Mr. Benton replied, "No," and stated that he had resolved the issue with Defendant Nichols.  As soon as Mr. Benton was inside of the holding cell door, for no reason, Defendant Thompson, who was waiting inside the cell, grabbed Mr. Benton's legs from under him, slamming Mr. Benton's restrained body, including his head, onto the floor.  Mr. Benton lay on the floor, in a dazed state, for an unspecified amount of time.

74.     While Mr. Benton was on the ground, in restraints, and not resisting or posing a threat to USP Lee officers, Defendants placed a cotton swab soaked in an unspecified chemical into one of Mr. Benton's nostrils.  Based on the smell of the chemical and the burning of his nose, Mr. Benton believed the cotton swab had been soaked in mace, causing Mr. Benton to experience further disorientation and nausea.[36]  While in this even more vulnerable state, Defendants kicked

---

[35] *Program Statement on Receiving and Discharging Manual*, Federal Bureau of Prisons at 10 (Aug. 12, 2014), https://www.bop.gov/policy/progstat/5800_018.pdf.

[36] *Program Statement on Oleoresin Capsicum (OC) Aerosol Spray*, Federal Bureau of Prisons at 1–3 (Feb. 6, 2014), https://www.bop.gov/policy/progstat/5576_004.pdf (stating that, "OC aerosol spray may be used to incapacitate or disable disruptive, assaultive, or armed inmates posing a threat to the safety of others, or to institution security and good order."  Further, "Prior to any OC aerosol spray being used, staff must attempt verbal intervention to defuse the situation when feasible . . . The Bureau of Prisons authorizes staff to use force only as a last alternative after all other reasonable efforts to resolve a situation have failed.").

25

Mr. Benton while he was on the floor, in restraints, and undressed him from his travel clothes, and forced him into paper clothing. Mr. Benton was then picked up from the floor, and Defendant Nichols, Defendant A. Lawson, and Defendant Thompson dragged Mr. Benton up the stairs into a room in the SHU.

75. Once in the SHU, around 10:00 PM, Defendants Nichols, A. Lawson, and Thompson forced Mr. Benton into four-point restraints and chained him to a concrete slab, with his left leg shackled to the left side of the concrete slab and his right leg shackled to the right side of the concrete slab. Both of Mr. Benton's arms were shackled above his head. Defendants Nichols and A. Lawson began to beat, punch, and kick Mr. Benton's legs, abdomen, and ribs.

76. Defendants left the holding cell in the SHU and left Mr. Benton injured and alone chained to the concrete slab. While Mr. Benton lay in pain, several Defendants including… and other Unknown Defendants on different shifts took turns assaulting and beating Mr. Benton every two hours for nearly 42 hours, increasing the severity of the torture each time they came into the cell. Around 12:00 AM on February 9, 2023, a group of officers including Defendant Hamilton, Defendant Nichols, Defendant Fields, and Defendant Hoskins came in and poured a bottle of water, which contained saliva from chewing tobacco, onto Mr. Benton's face and in his mouth.[37]

77. Later, around 2:00 AM, Defendants Hamilton, Nichols, Bradburn and Fields came in and sprayed mace on Mr. Benton's testicles.

78. Around 4:00 AM, Defendants Bradburn, Mitchell, Hamilton, Nichols, and Hoskins again came into the holding cell to assault Mr. Benton. Defendant Fields stepped on top of the concrete slab, towering over Mr. Benton, and demanded Mr. Benton to "spread them," referring to

---

[37] *See generally, Program Statement on Use of Force and Application of Restraints*, Federal Bureau of Prisons (Nov. 30, 2005), https://www.bop.gov/policy/progstat/5566_006.pdf (Notably, waterboarding is not listed anywhere in BOP Policy as an approved use of force).

Mr. Benton's legs. Fearing what was to come, Mr. Benton closed his legs the best he could. Defendant Fields then asked, "Do you want me to kick them or stomp them?" Assuming Defendant Fields intended to further injure his genitals, Mr. Benton responded "kick them," choosing what he thought would be the least painful option. Defendant Fields proceeded to repeatedly kick and stomp on Mr. Benton's genitals, causing him to experience excruciating pain. Having subjected Mr. Benton's genitalia to extreme abuse, all of the officers left the holding the cell, leaving Mr. Benton to suffer in pain, alone and without medical attention.

79.     At some point later, after 4:00 AM, Defendants re-entered the holding cell and proceeded to spray mace on and around Mr. Benton's penis, causing him extreme irritation and pain.

80.     Each time Defendants assaulted Mr. Benton, they made derogatory and racial slurs against him. Further, Mr. Benton remained in full restraints and was denied access to any food or water during this entire 42-hour period. Mr. Benton was forced to urinate on himself at least four times as Defendants did not release or permit Mr. Benton at any time to use the bathroom.

81.     On the morning of February 9, 2023, Defendant Ashley, a nurse from Health Services, came in to purportedly conduct and record a medical assessment of Mr. Benton. Prior to recording this medical assessment, Defendant Ashley instructed Mr. Benton to state that he had "no injuries to report" while the camera was on, despite Mr. Benton's complaints that he was in pain and suffering from what he believed to be a broken rib. Following a punch in the face by Nurse Ashley, Mr. Benton obliged to his demands and said he did not have any injuries while being recorded. Once the camera went off, and while Nurse Ashley was still present, several officers continued their assault on Mr. Benton.

82.     At some point during this torture, Nurse Ashley administered what he told

27

Mr. Benton was a "tuberculosis injection," and did so without Mr. Benton's consent or any prior notification, while Mr. Benton remained in four-point restraints.

83.    Despite this interaction with USP Lee's Health Services staff and the multiple restraint checks that should have occurred during this period, Mr. Benton's records do not include any entries during February 2023 by Nurse Ashley, or any other Health Services staff at USP Lee, concerning an assessment of the injuries Mr. Benton sustained during this assault.

84.    Mr. Benton was not released from restraints until the morning of February 10, 2023 sometime between 6:00 AM and 8:00 AM, after approximately 42 hours of abuse.  Following his release from the restraints, Mr. Benton was put into another holding cell in the SHU that did not contain a shower.  Mr. Benton was left to sit on the floor of the holding cell for nearly two days with dried blood, urine, and mace covering his body.

85.    As a result of Defendants' conduct, Mr. Benton suffered multiple, severe physical injuries, including bruises and swelling to his head, abdomen and ribs, and feet; an injured scalp from hair being ripped from his head; bleeding and bruises to his wrists and ankles; burning to his nose; injuries to his genitalia; and damaged kidneys from being forced to hold his urine for long periods of time; as well as psychological injuries.

86.    In a Behavioral Management Plan assessment dated February 9, 2023, Dr. Capriles-Mercado, a doctor within Psychology Services at USP Lee, summarized an alleged conversation with Mr. Benton in which he reports that Mr. Benton was suicidal as a result of the continued use of restraints.  However, this conversation and assessment of Mr. Benton did not actually occur. Instead, Dr. Capriles-Mercado's false report that Mr. Benton was suicidal was an attempt to justify the Defendants' forcing Mr. Benton into four-point restraints and torturing him.

B.    June 2–3, 2023.

87.    On June 2, 2023, Mr. Benton was leaving the shower when Defendant Robbins

28

approached him, cursed at him, and called him "nigger." After Mr. Benton asked why he Defendant Robbins felt the need to verbally assault him while he was naked exiting the shower, Mr. Robbins warned him "don't worry about it, I'll be coming back."

88.    A short while later, Defendants Robbins, Fischer, Mitchell, and Parsons returned to Mr. Benton's cell to place him in ambulatory restraints and proceeded to beat him. After the restraints were applied, Mr. Benton was placed in a holding cell in the SHU, where these same Defendants would return every two hours to continue to beat Mr. Benton. During these two-hour increments of abuse, Defendants grabbed Mr. Benton's genitalia, scratched his raw skin, punched and kicked him, and attempted to smash his body with riot shields. This abuse of Mr. Benton went on for over 24 hours.

89.    During this 24-hour period, Defendant Caudill, who works in Health Services at USP Lee, conducted one medical assessment, and despite Mr. Benton's complaints of an injured back and that his restraints were so tight they caused bruising, reported no injuries.

90.    Once he was released from the restraints and returned to his regular cell,, Mr. Benton continued to seek medical attention for his injuries. He received none.

C.    June 29, 2023.

91.    On June 29, 2023, Mr. Benton's cell was searched, and USP Lee staff removed all of his property, including legal documents that supported the lawsuit he intended to file regarding the conditions at USP Lee. Before removing these documents, Defendant Fischer read them and warned Mr. Benton that he was wasting his time in trying to obtain his medical records and in filing grievances.

92.    Following the search of his cell, Mr. Benton was placed in ambulatory restraints and beaten again by USP Lee officers. During this encounter, Defendant Turner tightened the cuffs around Mr. Benton's wrists, punched him, tore out locks of his hair, and made derogatory remarks,

29

including calling Mr. Benton "nigger.".  Defendant Jackson punched Mr. Benton in the face with such strength that Mr. Benton's tooth was chipped.  Defendant Fischer called Mr. Benton an "ugly ass nigger" and told him to stop talking to female guards because he was not white.  Defendant Fischer also warned Mr. Benton to stop filing administrative grievances against USP Lee officers against the threat of additional abuse.  Defendant Fischer exclaimed that Mr. Benton's attempts to file grievances against Defendants "won't work, so stop doing it."  He made this declaration while he stomped Mr. Benton's feet and while bending Mr. Benton's shackled hands in a manner that caused excruciating pain.

93.    After this incident Mr. Benton suffered swollen and bruised feet, bruised and bleeding wrists and ankles, and a bleeding mouth.  Mr. Benton again submitted multiple cop-outs requesting medical attention for his injuries, but received none.

94.    Following the June 29, 2023 search and assault by USP Lee officers, Mr. Benton received a false incident report from Officer B. Terry, in which she alleged that Mr. Benton had verbally assaulted her.  This false incident report is part of a practice perpetuated by Defendant Mitchell and others at USP Lee of orchestrating violence and retaliation against residents, such as Mr. Benton, by falsifying incident reports providing an excuse for the use of excessive force and that allege that Officer B. Terry was present at the time of an infraction, when she, in fact, was not.

D.    July 29, 2023.

95.    On July 29, 2023, Defendant A. Lawson gave Mr. Benton what was labeled a "diet tray" which did not contain the appropriate amount of food that Mr. Benton typically received.  In an attempt to get an officer's attention, Mr. Benton pressed the emergency button in his cell.  Defendant Parsons responded and told Mr. Benton he would bring him another tray.  However, Defendant Parsons did not come back with another tray.  Instead, Defendant Parsons entered the cell with Defendants Bradburn, Mitchell, and Jackson who all began assaulting Mr. Benton.

30

Defendant Bradburn and Defendant Jackson repeatedly punched, kicked, and slammed Mr. Benton against the wall, while Defendant Mitchell supervised this torture.

96.    Mr. Benton was forced onto his knees and was told to place his head against the wall.  While Mr. Benton was in that position, Defendants Bradburn, Mitchell, and Jackson all took turns slamming a shield into Mr. Benton's body.  This abuse lasted for over five minutes.  At no point did Mr. Benton demonstrate that he posed any risk to the safety of Defendants.

97.    Defendants then again placed Mr. Benton into four-point restraints and again shoved a cotton ball sprayed with mace into Mr. Benton's nostrils.  Every time Defendants, Roberts, Mitchell, and Bradburn, and sometimes along with Defendant Neff, entered Mr. Benton's cell, they punched him.  Defendant Mitchell inappropriately touched, grabbed, and abused Mr. Benton's genitals while he lay helpless in restraints.

98.    During this abuse, Defendants yelled at Mr. Benton to "lie down," which Mr. Benton understood to mean that he should stop filing grievances regarding USP Lee officer misconduct.  Defendants further warned Mr. Benton "to stay out of [their] way."

99.    Mr. Benton's genitalia remained bruised, painful to the touch, and swollen for two weeks after this incident.  Mr. Benton sought medical attention for these injuries.  But, again, Mr. Benton never received medical attention from Health Services at USP Lee.  Mr. Benton also experienced bruising and pain to his ribs and back and sought medical treatment for these injuries. But, again, he received no medical treatment.

100.    On August 13, 2023, Mr. Benton received a falsified incident report for destruction of property after Defendant Thompson accused him of burning a wick and, therefore, burning a hole in a cell window.  At the Disciplinary Hearing related to the August 13, 2023 incident report, Discipline Hearing Officer (DHO) Brown remarked to Mr. Benton, "You will never beat a shot with

me."

101.    On several occasions, following these, Mr. Benton's attempts to file administrative grievances related to his physical abuse and the injuries he suffered were thwarted by Defendants who refused to provide Mr. Benton with grievance forms or seized or destroyed Mr. Benton's grievance forms and property, including other legal documents and notes containing details of these incidents.

## CAUSES OF ACTION

### COUNT ONE

*Violation of Plaintiff's Eighth Amendment Rights*
*(Against Defendants Garland, Peters, Gomez, and Gilley in their official capacities)*

102.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

103.    The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment."

104.    Defendants engaged and continue to engage in a pattern, practice, or policy of failing to intervene to protect Mr. Benton and other residents from known and repeated intentional and unjustified acts of violence at the hands of Defendant Nichols, Defendant Mitchell, Defendant Thomas, Defendant A. Lawson, Defendant Bradburn, Defendant Gilbert, Defendant Gilmer, Defendant Fields, Defendant Thompson, Defendant Turner, Defendant Hamilton, Defendant Hoskins, Defendant Parsons, Defendant Fischer, Defendant Robbins, and Defendant Jackson, and their deliberate indifference to Mr. Benton's serious medical needs.  In so doing, they deprived Mr. Benton and others of their constitutional right to be free from cruel and unusual punishment. This violence and indifference will continue unless the BOP's patterns, practices, culture, and policies are changed.  If appropriate declaratory and injunctive relief is not granted, the harms

32

suffered will be irreparable, may lead to death, and will continue for the foreseeable future.

105.    Defendants' acts and omissions have caused serious injury to Mr. Benton. Mr. Benton is entitled to injunctive relief.

## COUNT TWO

*Violation of Plaintiff's Eighth Amendment Rights*
*(Against Defendant Nichols, Defendant Mitchell, Defendant Thomas, Defendant A. Lawson, Defendant Bradburn, Defendant Gilbert, Defendant Gilmer, Defendant Fields, Defendant Thompson, Defendant Turner, Defendant Hamilton, Defendant Hoskins, Defendant Parsons, Defendant Fischer, Defendant Robbins, Defendant Jackson, and Defendant Ashley)*

106.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

107.    The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment."

108.    As outlined above, on or around the dates of February 8, 2023 through February 10, 2023; June 2, 2023 through June 3, 2023; June 29, 2023; and July 29, 2023, Mr. Benton was brutally beaten, without justification and for the very purpose of causing harm, by Defendant Nichols, Defendant Mitchell, Defendant Thomas, Defendant A. Lawson, Defendant Bradburn, Defendant Gilbert, Defendant Gilmer, Defendant Fields, Defendant Thompson, Defendant Turner, Defendant Hamilton, Defendant Hoskins, Defendant Parsons, Defendant Fischer, Defendant Robbins, Defendant Jackson, and Defendant Ashley, while being held in various forms of restraints, in violation of explicit BOP policies and the Eighth Amendment.

109.    Mr. Benton sustained severe physical injuries, including bruises and swelling to his head, abdomen and ribs, and feet; an injured scalp from hair being ripped from his head; bleeding and bruises to his wrists and ankles; burning to his nose; injuries to his genitalia; and damaged kidneys, as well as emotional and mental damages, as a result of the Defendants' assault on or around February 8, 2023 through February 10, 2023; June 2, 2023 through June 3, 2023; June 29,

33

2023; and July 19, 2023.

110.    As a direct, foreseeable, and proximate result of the Defendants' deliberate indifferences to Mr. Benton's health and safety in violation of his Eighth Amendment rights on or around February 8, 2023 through February 10, 2023; June 2, 2023 through June 3, 2023; June 29, 2023; and July 29, 2023, Mr. Benton has suffered damages, including, without limitation, incidental, actual, consequential, and compensatory damages.  Additionally, as a result of the Defendants' egregious, intentional, and reckless conduct in conscious disregard for Mr. Benton's safety, as well as their pattern and practice of repeatedly violating Mr. Benton's Eighth Amendment rights, Mr. Benton is entitled to punitive damages, as well as such other appropriate damages and relief permitted by law, all in an amount to be determined at trial.

<u>COUNT THREE</u>

*Violation of Plaintiff's Eighth Amendment Rights*
*(Against Defendant Streeval andDefendant Ashley)*

111.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

112.    The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment." This includes the right to be protected from known and substantial risks of serious harm.

113.    As outlined above, on or around February 8, 2023 through February 10, 2023; June 29, 2023; and July 29, 2023, Mr. Benton was brutally beaten, without justification, by Defendant Nichols, Defendant Mitchell, Defendant Thomas, Defendant A. Lawson, Defendant Bradburn, Defendant Gilbert, Defendant Gilmer, Defendant Fields, Defendant Thompson, Defendant Turner, Defendant Hamilton, Defendant Hoskins, Defendant Parsons, Defendant Fischer, Defendant Robbins, Defendant Jackson, and Defendant Ashley, while being held in

34

various forms of restraints, in violation of explicit BOP policies and the Eighth Amendment.

114.    Defendant Ashley, in addition to violating Mr. Benton's Eighth Amendment right to be free cruel and unusual punishment by punching him in the face, witnessed the abuse against Mr. Benton by USP Lee officers and disregarded and failed to protect Mr. Benton from the risk of known, unnecessary, and gratuitous force, and was deliberately indifferent to his health and safety.

115.    Defendant Streeval also violated Mr. Benton's Eighth Amendment rights by disregarding and failing to protect him from the risk of known, unnecessary, and gratuitous force, in deliberate indifference to Mr. Benton's health and safety.

116.    Mr. Benton sustained severe physical injuries, including bruises and injuries to his ribs and body; bleeding of his wrists, ankles, mouth, and toes; injuries to his genitalia; a chipped tooth; a swollen and painful scalp from hair being ripped from his head; and injuries to his kidneys; as well as emotional and mental damages, as a result of the Defendants' assaults and the acquiescence of Defendant Nichols, Defendant Mitchell, Defendant Thomas, Defendant A. Lawson, Defendant Parsons, Defendant Bradburn, Defendant Turner, Defendant Jackson, and Defendant Fischer on or around February 8, 2023 through February 10, 2023; June 29, 2023; and July 29, 2023.

117.    As a direct, foreseeable, and proximate result of the Defendants' deliberate indifference to Mr. Benton's health and safety, in violation of his Eighth Amendment rights on February 8, 2023 through February 10, 2023; June 29, 2023; and July 29, 2023, Mr. Benton has suffered damages, including, without limitation, incidental, actual, consequential, and compensatory damages. Additionally, as a result of the Defendants' egregious, intentional, and reckless conduct in deliberate indifference to Mr. Benton's safety, as well as their pattern and practice of repeatedly violating Mr. Benton's Eighth Amendment rights, Mr. Benton is entitled to

punitive damages, as well as such other appropriate damages and relief permitted by law, all in an amount to be determined at trial.

<u>COUNT FOUR</u>

*Violation of Plaintiff's Eighth Amendment Rights*
*(Against Defendant Nurse Ashley, Defendant Caudill, and Defendant Capriles-Mercado)*

118.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

119.    The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment."  This right includes the right of residents in federal prison to receive adequate medical care.

120.    As outlined above, on or around February 8, 2023 through February 10, 2023; June 29, 2023; and July 29, 2023, Mr. Benton was brutally beaten by certain of the Defendants while being held in various forms of restraints, in violation of explicit BOP policies and the Eighth Amendment.  When Mr. Benton sought medical assistance for his injuries sustained in these assaults, he was ignored.  In addition, Defendants Ashley, Caudill, and Capriles-Mercado, in coordination with other Defendants, collaborated in making false records to conceal Mr. Benton's abuse and resulting injuries and to withhold medical treatment for severe injuries that included, at minimum, a broken bone and head trauma.

121.    Mr. Benton sustained extensive physical and mental injuries as a result of the Defendants' assaults on or around February 8, 2023 through February 10, 2023; June 29, 2023; and July 29, 2023.  Despite Mr. Benton's repeated requests, Defendants Ashley, Caudill, and Capriles-Mercado failed to provide any medical or mental health care whatsoever for these injuries, leaving Mr. Benton in excruciating physical and mental pain for a period of several weeks.

122.    As a direct, foreseeable, and proximate result of Defendant Ashley's, Defendant

36

Caudill's, and Defendant Capriles-Mercado's deliberate indifference to Mr. Benton's serious medical needs, Mr. Benton has suffered unnecessary and wanton infliction of pain in violation of the Eighth Amendment. And as a result, he is entitled to damages, including, without limitation, incidental, actual, consequential, and compensatory damages. Additionally, as a result of Defendant Ashley's, Defendant Caudill's, and Defendant Capriles-Mercado's egregious, intentional, and reckless conduct in conscious disregard for Mr. Benton's safety, as well as their pattern and practice of repeatedly violating Mr. Benton's Eighth Amendment rights, Mr. Benton is entitled to punitive damages, as well as such other appropriate damages and relief permitted by law, all in an amount to be determined at trial.

COUNT FIVE

*Assault and Battery Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b)*
*(Against Defendant United States of America)*

123.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

124.    The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts, including intentional torts arising out of assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution, committed by persons acting on behalf of the United States of America, including the acts or omissions of investigative or law enforcement officers of the United States Government.

125.    Under Virginia law, assault is established by: (1) an act intended to cause either harmful or offensive contact with another person, or (2) apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery. Battery is an unwanted touching which is neither consented to, excused, nor justified.

126.    As outlined above, on or around February 8, 2023 through February 10, 2023; June

37

29, 2023; and July 29, 2023, the Individual Defendants repeatedly touched Mr. Benton in a vicious, rude, insulting, brutal, unwanted, and offensive manner, thereby causing Mr. Benton significant harm. Beyond mere touching, the Individual Defendants, on several occasions relevant to this Complaint, without provocation or justification, slammed Mr. Benton into walls; rammed Mr. Benton's head into windows while being transferred on a bus from USP Atlanta to USP Lee; forcibly dragged Mr. Benton on and off the buses during his transfer; tripped Mr. Benton from under his feet causing him to fall and hit his head on the floor; punched, kicked, and brutally beat Mr. Benton during purported searches and while he was in full restraints; tore Mr. Benton's hair from his scalp; tortured Mr. Benton while he was in restraints by placing cotton swabs soaked with mace into his nose and attempting to waterboard him; repeatedly slammed a riot shield into Mr. Benton's sides and ribs; kicked and stomped on Mr. Benton's genitalia while he was in full restraints, causing excruciating pain and injuries; and, particularly Defendant Mitchell, sexually assaulted Mr. Benton by grabbing and touching his genitalia without his consent while he was in restraints. At times, the assault and battery against Mr. Benton by the Individual Defendants occurred while he was naked and exposed, causing severe and lasting injuries to his body.

127. These touchings by the Individual Defendants were unsolicited by Mr. Benton, unwanted, and wholly inappropriate. The touchings were neither consented to, excused, nor justified. Furthermore, the Individual Defendants engaged in acts, including berating Mr. Benton and using derogatory remarks such as "nigger" against him, intending to cause harmful and offensive contact with Mr. Benton to create a reasonable apprehension of immediate, unwanted touching of Mr. Benton. These acts constitute assault and battery.

128. At the times the tortious conduct by the Individual Defendants was committed against Mr. Benton, each of the Individual Defendants were acting within the scope of his or her

38

employment duties as officers and agents of the federal government, and therefore, such conduct is imputable to Defendant United States of America.

129.    The actions by the Individual Defendants were malicious, intentional, and amounted to extreme and outrageous conduct.  As a proximate result of such conduct, Mr. Benton has and continues to suffer physical injuries, including bruises and injuries to his ribs and body, bleeding of his wrists, ankles, mouth, and toes, injuries to his genitalia, a chipped tooth, a swollen and painful scalp from hair being ripped from his head, and damaged kidneys, as well as emotional pain and suffering for which the United States of America is liable.

<u>COUNT SIX</u>

*(Negligence Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b))*
*(Against Defendant United States of America)*

130.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

131.    The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

132.    Under Virginia law, a negligence claim is established by:  (1) the existence of a duty of care; (2) breach of that duty; (3) legal causation; and (4) damages.

133.    The Individual Defendants, in the exercise of reasonable care, and pursuant to their authority and responsibilities as officials, employees, and/or agents of the United States of America, had a duty to know, or should have known, that the Individual Defendants' conduct on or around February 8, 2023 through February 10, 2023; June 29, 2023; and July 29, 2023, including:  failing to protect Mr. Benton; torture, assault, and sexual harassment and abuse of Mr. Benton; unreasonable searches and seizures; violations of Mr. Benton's due process and equal protection

39

rights; derelictions of duty and negligence leading to the repeated and unjustified assault of Mr. Benton; deliberate indifference to Mr. Benton's life and safety; the Individual Defendants' subjection of Mr. Benton to cruel and unusual punishment; provision of unlawful living conditions; denial of medical treatment to Mr. Benton; the unlawful imprisonment of Mr. Benton; the seizure and denial of Mr. Benton's access to legal materials; failing to provide Mr. Benton access to legal and administrative remedies by means of intimidation and retaliatory excessive force; and falsifying official prison reports against Mr. Benton, was unreasonably dangerous because it placed Mr. Benton at risk of physical and mental injury.

134. The Individual Defendants, in their capacity as and pursuant to their authority and responsibilities as officials, employees, and/or agents of the United States of America, breached their duty by failing to carefully investigate, monitor, supervise, provide, and/or oversee the duties of the Individual Defendants to Mr. Benton at USP Lee, including, but not limited to, the development, implementation, and supervision of adequate policies and practices for the imprisonment of residents in the SHU; guidelines for the appropriate use of force, including the placement of residents in restraints, and the failure of officers to use appropriate force at USP Lee; falsifying Mr. Benton's records to justify these failures; and threatening the Mr. Benton with retaliation for accessing his right to legal and administrative remedies as a result of these failures.

135. The Individual Defendants, in their capacity as and pursuant to their authority and responsibilities as officials, employees, and/or agents of the United States of America, negligently and/or carelessly failed to protect Mr. Benton from harm, including assault and torture, by USP Lee officers.

136. The Individual Defendants knew or should have known that Mr. Benton would foreseeably suffer injury as a result of the Individual Defendants' failure to exercise reasonable care

40

in the discharge of their official duties and/or common-law duties of care described herein.

137.    As a direct and proximate result of the negligence and carelessness of the Individual Defendants, Mr. Benton has suffered extreme physical, emotional, and mental distress.  As a direct and proximate result of the Individual Defendants' acts or omissions, Mr. Benton has suffered injuries for which he seeks compensatory and actual damages against the United States.

<u>COUNT SEVEN</u>

*(Medical Malpractice Pursuant to the Federal Tort Claims Act 28 U.S.C. § 1346(b))*
*(Against Defendant United States of America)*

138.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

139.    The Federal Tort Claims Act permits private parties to sue the United States of America in a federal court for torts committed by persons acting on behalf of the United States of America.

140.    Virginia law recognizes medical malpractice claims where a plaintiff establishes that a defendant violated the applicable standard of care and, therefore, was negligent, and that the defendant's negligent acts were the proximate cause of injury or death.

141.    Defendant Ashley, Defendant Caudill, and Defendant Capriles-Mercado, in their capacity as pursuant to their authority and responsibilities as officials, employees and/or agents of the United States of America, owed Plaintiff a duty to render medical and mental health care and services using the reasonable care, skill, or knowledge ordinarily used under similar circumstances.

142.    Defendant Ashley, Defendant Caudill, and Defendant Capriles-Mercado breached their duty of care by failing to ensure that Plaintiff received from them reasonable care, skill, or knowledge ordinarily used under similar circumstances incident to his medical and mental health care and treatment.

143.    As a proximate and causal result of the malpractice of the Defendant Ashley, Defendant Caudill, and Defendant Capriles-Mercado, Mr. Benton has endured physical, mental, and emotional pain and suffering for which the United States of America is liable.

## RELIEF SOUGHT

A.    Plaintiff seeks to be fully and fairly compensated for his injuries, pain, suffering, emotional, and mental distress to the fullest extent permitted under federal law.

B.    Plaintiff requests $10,000,000 in compensatory damages from Defendants.

C.    Plaintiff requests $5,000,000 in punitive damages from Defendants.

D.    Plaintiff requests pre-judgment interest and post-judgment interest, together with an award of fees incurred in this case (including attorneys' fees), expenses, disbursements, and costs arising from this action; and

E.    Plaintiff requests any and all other relief this Court deems just and proper.

## JURY DEMAND

Plaintiff requests a trial by jury on all counts so triable.

Dated:  July 8, 2024                              Respectfully submitted,

[Signatures on the following page]

42

*/s/ W. Hunter Winstead*
**W. Hunter Winstead**
Virginia Bar Number: 66770
December L. Huddleston
(*pro hac vice* forthcoming)
William H. Swain
(*pro hac vice* forthcoming)
Gilbert LLP
700 Pennsylvania Avenue, SE
Suite 400
Washington, DC 20003
Telephone:   (202) 772-2301
Email: WinsteadH@GilbertLegal.com
Email: HuddlestonD@GilbertLegal.com
Email: SwainW@GilbertLegal.com

*/s/ Kristin L. McGough*
Kristin L. McGough
(*pro hac vice* forthcoming)
Washington Lawyers' Committee for Civil
Rights and Urban Affairs
700 14th Street, NW
Suite 400
Washington, DC 20005
Telephone:   (202) 319-1000
Email: Kristin_McGough@washlaw.org

*Counsel for Plaintiff Natori Benton*